IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 21, 2021 Session

## RACHAEL GREEN ET AL. V. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. T20192526          James A. Haltom, Commissioner**

———————————————————

## No. M2020-01244-COA-R3-CV

———————————————————

In this action filed against the State of Tennessee ("the State"), alleging negligence by employees of the Tennessee Department of Children's Services ("DCS"), the Claims Commission ("the Commission") dismissed the plaintiffs' claims due to lack of subject matter jurisdiction.    Determining that subject matter jurisdiction existed in the Commission, we vacate the Commission's order and remand this matter to the Commission for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Vacated; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

W. Gary Blackburn and Bryant Kroll, Nashville, Tennessee, and Robin C. Moore, Carthage, Tennessee, for the appellants, Rachael Green and Logan White.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; and M. Andrew Womack, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

The plaintiffs, Rachael Green ("Mother") and Logan White ("Father") (collectively, "Parents"), filed a claim with the State of Tennessee Division of Claims Administration on May 15, 2019, concerning the death of their two-year-old child, Z.W.G. ("the Child").  According to Parents' claim, the Child had been removed from

Mother's home in Sumner County by DCS and placed in a home in Warren County that DCS knew to be unsafe. The Child died four months later when he asphyxiated while co-sleeping with his caregiver in a recliner.

Parents' claim further stated that DCS had an open case involving Mother in January 2018. According to Parents, the DCS case manager assigned to Mother, Kalee McSwain, encouraged Mother to sign an Immediate Protection Agreement ("IPA") concerning her three children, D.G., A.S., and the Child. Mother agreed to sign the IPA, granting supervision of the children to David and Pamela M., A.S.'s paternal grandparents ("Grandparents"). Parents asserted that by virtue of the IPA and placement of the children in the home of Grandparents, DCS was in control of the children for the purposes of Tennessee Code Annotated § 9-8-307(a)(1)(E), which concerns claims against the State alleging the "negligent care, custody and control of persons."

Parents averred that DCS was required to follow a set protocol before placing the children in the home, including a placement assessment and home visit. Parents urged that DCS was also required to provide sufficient furniture for safe sleep and to ensure that it was installed and being used properly. According to Parents, when a DCS staff member in Warren County visited Grandparents' home, she reported to Ms. McSwain that the home was not safe and advised against placing the children in the home. Parents pointed out that Ms. McSwain was specifically told that the home had only a single functional bathroom and one functional bedroom. Despite this information, Ms. McSwain proceeded to place the children in Grandparents' home. Moreover, Parents advance that Ms. McSwain never visited the home because she did not want to drive the distance and failed to request that Warren County DCS workers perform another visit. Four months later, the Child tragically died from co-sleeping in a recliner with Pamela M. Ms. McSwain and her supervisor, Cicely Dixon, were subsequently terminated by DCS for negligence.

Parents attached to their claim, *inter alia*, copies of the separation notices issued by DCS to Ms. McSwain and Ms. Dixon in September 2018 along with memoranda explaining the reasons for their discharge from employment. The information contained in the memoranda substantiates Parents' claims regarding the unsafe nature of Grandparents' home and Ms. McSwain's knowledge of that fact when she placed the Child in the home.

On September 17, 2019, Parents filed a complaint against the State with the Commission, stating that the case had been transferred to the Commission by the Division of Claims Administration. The substantive allegations of the complaint were substantially the same as those contained in the earlier claim and outlined above.

On December 4, 2019, the State filed a motion to dismiss pursuant to Tennessee Rule of Civil Procedure 12.02(1), propounding that the Child was not in the "care,

- 2 -

custody, or control" of the State at the time of his death. According to the State, the Sumner County Juvenile Court ("juvenile court") had entered an order on April 18, 2018, placing the Child in the temporary custody of Grandparents. The State argued that this grant of custody to Grandparents meant that the Child was no longer in the care, custody, or control of the State and that Parents' claim would not fall within the parameters of Tennessee Code Annotated § 9-8-307(a)(1)(E). The State thus posited that the Commission had no subject matter jurisdiction to adjudicate the claim and that the claim was barred by sovereign immunity. Copies of the juvenile court's orders were attached to the State's motion.

Parents filed a response in opposition to the motion to dismiss, asserting that the juvenile court's orders only applied to Mother's other children, A.S. and D.G., because no specific allegations of abuse or neglect had been raised concerning the Child. Parents further postulated that Mother's execution of the IPA did not grant custody of the Child to Grandparents. Parents claimed that DCS maintained control over the Child and had a duty to oversee his welfare by virtue of the IPA that Ms. McSwain had requested Mother to sign. Parents therefore contended that their claim against the State was properly filed pursuant to Tennessee Code Annotated § 9-8-307(a)(1)(E). In support, Parents attached a declaration of Sonia Boss, who was the guardian *ad litem* for the children.

The State filed a reply and attached an affidavit executed by Nicole Fisher, DCS Assistant General Counsel. Ms. Fisher explained that an IPA

> is a voluntary agreement signed by the parent or legal custodian to place alleged child victims with a chosen caregiver when the parent or legal custodian cannot protect the children from abuse and neglect.
>
> An IPA can be revoked by the parent or legal custodian at any time and does not transfer legal custody of the children to the Department of Children's Services.

(Paragraph numbering omitted.) Ms. Fisher further stated that the juvenile court's April 18, 2018 order placed the Child and his siblings in the temporary custody of Grandparents.

On August 12, 2020, the Claims Commission entered an order granting the State's motion to dismiss. The Commission found that the juvenile court's orders granted custody of the Child to Grandparents. Accordingly, the Commission determined that DCS did not have care, custody, or control of the Child at the time of his death and that the Commission lacked subject matter jurisdiction regarding Parents' claims. The Commission subsequently entered an amended order on August 26, 2020. Parents timely appealed.

## II. Issues Presented

Parents present the following issues for our review, which we have restated slightly:

1. Whether the Claims Commission erred in determining that the Child was not in the care or control of DCS at the time of his death.

2. Whether DCS had control over the Child's placement for purposes of establishing subject matter jurisdiction before the Claims Commission prior to any orders transferring custody.

3. Whether the juvenile court's orders applied to the Child, who was referenced in the case caption but was not specifically mentioned in the body of the pleadings.

The State frames the overarching issue, which we have also slightly restated, as follows:

4. Whether the Commission properly dismissed Parents' claim under Tennessee Code Annotated § 9-8-307(a)(1)(E) for lack of subject matter jurisdiction because the State did not have care, custody, or control of the Child.

## III. Standard of Review

Regarding the proper standard of review to be applied concerning the grant of a motion to dismiss for lack of subject matter jurisdiction, pursuant to Tennessee Rule of Civil Procedure 12.02(1), our Supreme Court has explained:

> A motion to dismiss for lack of subject matter jurisdiction falls within the purview of Tenn. R. Civ. P. 12.02(1). Challenges to a court's subject matter jurisdiction call into question the court's "lawful authority to adjudicate a controversy brought before it," *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000), and, therefore, should be viewed as a threshold inquiry. *Schmidt v. Catholic Diocese of Biloxi*, 2008-CA-00416-SCT (¶ 13), 18 So.3d 814, 821 (Miss. 2009). Whenever subject matter jurisdiction is challenged, the burden is on the plaintiff to demonstrate that the court has jurisdiction to adjudicate the claim. *See Staats v. McKinnon*, 206 S.W.3d 532, 543 (Tenn. Ct. App. 2006); 1 Lawrence A. Pivnick, *Tennessee Circuit Court Practice* § 3:2 (2011 ed.) ("Pivnick").
>
> Litigants may take issue with a court's subject matter jurisdiction using either a facial challenge or a factual challenge. *See, e.g., Schutte v.*

- 4 -

*Johnson,* 337 S.W.3d 767, 769-70 (Tenn. Ct. App. 2010); *Staats v. McKinnon*, 206 S.W.3d at 542. A facial challenge is a challenge to the complaint itself. *See Schutte v. Johnson*, 337 S.W.3d at 769. Thus, when a defendant asserts a facial challenge to a court's subject matter jurisdiction, the factual allegations in the plaintiff's complaint are presumed to be true. *See, e.g.*, *Staats v. McKinnon*, 206 S.W.3d at 542-43.

Alternatively, "[a] factual challenge denies that the court actually has subject matter jurisdiction as a matter of fact even though the complaint alleges facts tending to show jurisdiction." *Staats v. McKinnon*, 206 S.W.3d at 543. Thus, the factual challenge "attacks the facts serving as the basis for jurisdiction." *Schutte v. Johnson*, 337 S.W.3d at 770.

*Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 445-46 (Tenn. 2012).

In the case at bar, DCS mounted a factual challenge to the petition, filing various attachments in support of the motion. "When resolving a factual attack on subject matter jurisdiction, a court may consider matters outside the pleadings, such as affidavits or other documents." *Church of God in Christ, Inc. v. L. M. Haley Ministries, Inc.*, 531 S.W.3d 146, 160 (Tenn. 2017). Our High Court has further explained:

[M]otions challenging subject matter jurisdiction are not converted to summary judgment motions when matters outside the pleadings are considered or when disputes of material fact exist. Rather, courts presented with such motions must weigh the evidence, resolve any factual disputes, and determine whether subject matter jurisdiction exists. The trial court may hold an evidentiary hearing limited to the question of subject matter jurisdiction if necessary to resolve jurisdictional factual disputes. Regardless of the manner used, the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over the case.

*Id*. (internal citations omitted).

Moreover, as this Court has elucidated concerning its review of a decision from the Claims Commission:

Our review of decisions of individual claims commissioners and those of the Claims Commission are governed by the Tennessee Rules of Appellate Procedure. T.C.A. § 9-8-403(a)(1). Decisions by the Commission are reviewed pursuant to the standard of review for non-jury cases. Tenn. R. App. P. 13(d). The factual findings of the Claims Commission are reviewed de novo with a presumption of correctness. The

presumption must be honored unless this court finds that the evidence preponderates against those findings. *Beare Co. v. State*, 814 S.W.2d 715, 717 (Tenn. 1991). Questions of law are reviewed de novo, without a presumption of correctness. *Crew One Prods, Inc. v. State*, 149 S.W.3d 89, 92 (Tenn. Ct. App. 2004).

*Mullins v. State*, No. M2008-01674-COA-R3-CV, 2009 WL 1372209, at *5 (Tenn. Ct. App. May 15, 2009) ("*Mullins I*").

## IV. Subject Matter Jurisdiction

The overarching issue in this matter concerns whether the Commission maintained subject matter jurisdiction to adjudicate Parents' claim. Parents alleged negligence on the part of DCS by, *inter alia*, allowing the Child to be temporarily placed in Grandparents' home when Ms. McSwain, the DCS case manager, knew that the home was unsuitable. The Commission ultimately determined that DCS did not have care, custody, or control of the Child at the time of his death and that the Commission therefore lacked subject matter jurisdiction regarding Parents' claim. Following our thorough review of the record and applicable law, we disagree with the Commission's conclusion that it lacked subject matter jurisdiction over the claim.

As our Supreme Court has previously explained concerning claims against the State:

It has long been well-established that the State of Tennessee, as a sovereign, is immune from lawsuits "'except as it consents to be sued.'" *Stewart* [*v. State*], 33 S.W.3d [785,] 790 [(Tenn. 2000)] (quoting *Brewington v. Brewington*, 215 Tenn. 475, 387 S.W.2d 777, 779 (1965)). The doctrine of sovereign immunity "'has been a part of the common law of Tennessee for more than a century.'" *Id*. (quoting *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 14 (Tenn. 1997)). The rule of sovereignty is both constitutional and statutory. Article I, section 17 of the Tennessee Constitution provides that "[s]uits may be brought against the State in such manner and in such courts as the Legislature may by law direct." Tennessee Code Annotated section 20-13-102(a) (2009) provides that

[n]o court in the state shall have any power, jurisdiction or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds or property, and all such suits shall be dismissed as to the state . . . .

Exercising its constitutional prerogative to allow suits against the State, the General Assembly in 1984 enacted a comprehensive procedure for the filing, prosecution, and disposition of monetary claims against the State. As a part of this statutory scheme, the Tennessee Claims Commission, consisting of one commissioner from each grand division of the State, was created to hear and determine claims against the State. *See* Act of May 24, 1984, ch. 972, §§ 1, 5(a), 1984 Tenn. Pub. Acts 1026, 1027-28 (codified at Tenn. Code Ann. § 9-8-301(a), -305(1) (Supp.1984)).

The Claims Commission and its commissioners have exclusive jurisdiction to adjudicate all monetary claims against the State which fall within certain specified categories as defined by the statute. *Id.* §§ 5(a), 8(a), 1984 Tenn. Pub. Acts at 1028-30 (codified at Tenn. Code Ann. §§ 9-8-305(1), -307(a)); *Conley v. State*, 141 S.W.3d 591, 597 (Tenn. 2004); *see also* Tenn. Code Ann. § 20-13-102(a). The legislature did not remove immunity for all claims against the State, but only those claims specified in section 9-8-307(a). It follows then that the Claims Commission lacks subject matter jurisdiction and has no authority to hear any claims that fall outside the categories enumerated in section 9-8-307(a). *Stewart*, 33 S.W.3d at 790.

*Mullins v. State*, 320 S.W.3d 273, 278-79 (Tenn. 2010) ("*Mullins II*").

Parents herein filed their claim pursuant to Tennessee Code Annotated § 9-8-307(a)(1)(E) (2020), which states:

The commission or each commissioner sitting individually has exclusive jurisdiction to determine all monetary claims against the state based on the acts or omissions of "state employees," as defined in § 8-42-101, falling within one (1) or more of the following categories:

* * *

Negligent care, custody and control of persons[.]

The Commission determined that the Child was not in the care, custody, or control of DCS, elucidating:

In *Mullins* [*I*], the Tennessee Court of Appeals addressed a similar situation to this case.[1] In *Mullins*, a child was heartbreakingly murdered

---

[1] Although the Commission did not include a citation for *Mullins* at this point in its order, the Commission appears to be referring to this Court's decision in *Mullins I*, although the Commission also

after he had been removed from his mother's home by DCS and voluntarily placed with a relative (the mother's aunt). After the child was initially removed from the home, the Davidson County Juvenile Court subsequently conducted a hearing, and pursuant to a court order, awarded custody of the child to a relative. Shortly thereafter, the aunt left the child to the supervision of her daughter, who was mentally challenged. The child subsequently died from injuries suffered while in the care of the mentally challenged daughter. The mother filed a lawsuit asserting that DCS was negligent for removing the child. Ultimately, the Claims Commission determined that it lacked jurisdiction because the Juvenile Court, not DCS, made the ultimate decision to place the child with the relative. The *Mullins* court further indicated that upon the Juvenile Court's placement of the child with the relative, the child left the care, custody, and control of the State at that time. The *Mullins* court further indicated that even if subject matter jurisdiction had existed, there could be no recovery as a matter of law because the proximate (and legal) cause of death were apparently actions of the aunt's daughter, not anything the State may or may not have done.

The Claimants argue that *Mullins* is not controlling and that *In re Demitrus* is the controlling case.[2] In that case, a six-month old child heartbreakingly drowned when he was left unattended in a bathtub while in the custody of a friend. The child had been placed with the friend through a DCS safety plan, voluntarily agreed upon by the mother, as the "placement caregiver." While the Juvenile Court had awarded custody in *Mullins*, the same was not true in the case of *In re Demitrus*. In that case, no Juvenile Court order awarding custody existed. Therefore, the Claims Commission correctly determined that it had subject matter jurisdiction over the claim, but found that the State was not negligent. On appeal, the Court of Appeals affirmed [that] the Claims Commission had jurisdiction, but reversed the dismissal as to negligence.

Here, on May 9, 2018, the Juvenile Court of Sumner County entered an Order Resetting Adjudicatory Hearing, which specifically granted temporary protective custody to [Grandparents] of all three children, including [the Child], who tragically died shortly thereafter on May 27, 2018. The bright line that distinguishes the *Mullins* case from *In re Demitrus* is the Juvenile Court's May 9, 2018 Order awarding temporary protective custody.

---

references the Supreme Court's decision in *Mullins II* in other parts of its order.

[2] *See In re Demitrus*, No. E2009-02349-COA-R3-CV, 2011 WL 863288 (Tenn. Ct. App. Mar. 14, 2011).

Prior to entry of the May 9, 2018 order, the IPA indicates that the children will reside in McMinnville until otherwise noted by DCS and/or Sumner County juvenile court. Had [the Child] died after entry of the IPA, but prior to the Juvenile Court awarding custody, the issue of subject matter jurisdiction could be a question of fact that might survive a motion to dismiss. But here, as set forth in *Mullins* and examined in *In re Demitrus*, the State (DCS) did not have care, custody, or control of [the Child] after the Juvenile Court entered its May 9, 2018 order awarding custody of the children to [Grandparents]. While the death of [the Child] is heartbreaking and tragic, the Tribunal must apply the law as interpreted by the Tennessee appellate courts as set forth in *Mullins*. Accordingly, the Claims Commission lacks subject matter jurisdiction.

Although we agree with the Commission's characterization of the holding in *Mullins I*, we disagree with the Commission's ostensible conclusion that the facts presented in *Mullins I* and *II* (collectively, "*Mullins*" when referring to common facts between the two decisions) are entirely on point with this case.

In *Mullins*, the record demonstrated that before the child was removed from his mother's home and placed in the home of the mother's aunt, the aunt and her home were investigated and found to be suitable by DCS. *See Mullins II*, 320 S.W.3d at 276. DCS therefore recommended that the child be placed in the custody of the mother's aunt, and the trial court did so. *Id*. DCS then closed its case file concerning the child, and a DCS case manager explained at trial that DCS no longer maintained a duty to supervise the placement. *Id*.

Notably, however, when the mother in *Mullins* initially brought her claim against DCS with the Commission, she alleged, *inter alia*, that DCS had failed to conduct an adequate investigation of the aunt's home environment before placing the child there, despite the fact that DCS had performed a background check concerning the aunt and had inspected the home and found it adequate prior to placement. *See Mullins I*, 2009 WL 1372209, at *5. The Commission determined, with respect to this particular claim, that DCS was entitled to quasi-judicial immunity concerning its investigation and recommendation with regard to the child's placement and, in the alternative, that DCS had not acted negligently. *Id*. at *9. The Commission ultimately determined, however, that it did not possess subject matter jurisdiction to consider any of the mother's claims. *Id*.

On appeal to this Court in *Mullins I*, when discussing the mother's particular claim concerning negligent investigation of the aunt's home before placement, this Court stated:

In this case . . . there is a period of time that the State had taken custody of the child. When [the child] was initially removed from Mother's home by DCS, he was clearly in the care, custody, and control of the State. In T.C.A. § 37-2-402(5), "foster care" is defined as

> the temporary placement of a child in the custody of the department of children's services or any . . . home, whether public or private, for care outside the home of a parent or relative (by blood or marriage) of the child, whether such placement is by court order, voluntary placement agreement, surrender of parental rights or otherwise. . . .

The one claim of Mother's that falls within this time frame is the contention that DCS was negligent in its investigation of the [aunt's] home prior to [the child's] placement there. In its Judgment, the Claims Commission held, in pertinent part, as follows:

> Ms. Mullins contends that DCS was negligent in that no interview or evaluation of Latara Williams was conducted to determine whether she posed a danger to the children prior to DCS's recommendation to the juvenile court that they be placed in the [aunt's] home. Defendant argues that DCS is entitled to quasi-judicial immunity with respect to its recommendations to a court relative to a child's custody placement, since it performs an essential role in the custody proceedings.
>
> * * *
>
> Social workers acting in an advisory role to a juvenile court are entitled to quasi-judicial immunity. *Rippy v. Hattaway*, 270 F.3d 416 (6th Cir. 2001), *cert. denied*, 537 U.S. 812, 123 S. Ct. 72, 154 L. Ed. 2d 15 (2002). In *Rippy*, the Court considered whether social[] workers charged with making a recommendation to a juvenile court as to whether a child who has been committed to DCS was ready to return home are entitled to quasi-judicial immunity. Equating the role of a social worker making a recommendation to a juvenile court to a probation officer making a sentencing, the *Rippy* Court noted that:
>
> > The function of making such recommendations, including the underlying investigation, is

> similarly intimately related to the judicial phase of the child custody proceedings. Social workers involved in the investigation or recommendation are, therefore, entitled to absolute immunity with respect to claims arising from such recommendations and investigations.

*Rippy v. Hattaway*, 270 F.3d 416, 422-423. Like *Rippy*, the proof here is that the ultimate decision of where to place the Mullins children was the juvenile court's. DCS, however, was required to make a recommendation relative to that placement, and that recommendation and the investigation attendant to the recommendation were intimately tied to the judicial process. Therefore, the State, which may raise this immunity pursuant to Tenn. Code Ann. § 9-8-307(d), has quasi-judicial immunity.

Even if DCS employees are not entitled to absolute immunity for acts taken in connection with the recommendation to the juvenile court to place the Mullins children in the [aunt's] home, the Commission finds the evidence does not preponderate in favor of a finding of negligence as to this issue. The proof demonstrated that DCS conducted the required criminal and background investigation and met with all of the interested parties, including Ms. Mullins, [aunt,] and Latara Williams. There is no evidence that Ms. Williams had any previous history of abusive or assaultive behavior that would have been uncovered by a more thorough investigation. Although Ms. Mullins stated in her referral on May 17, 2005, that Williams had been in special education classes and that she had the maturity level of a thirteen year old, there is no proof before the Commission that further investigation would have revealed these claims to be accurate or whether in fact they were accurate. Nor is [it] clear that either fact would render it more likely that Williams would have abused or assaulted [the child].

The proof established that [the aunt's] home was considered as a placement at Ms. Mullins['] request. Ms. Mullins wanted the children to be placed with her aunt, despite the fact that she knew Latara Williams and knew that she lived with her aunt. None of the other parties at the TDM voiced any

- 11 -

concerns relative to Williams. Based upon the facts submitted at trial, the Commission cannot conclude that Ms. Mullins sustained her burden of demonstrating that DCS's conduct with respect to its recommendation of the [aunt's] household fell beneath the standard of care, such that it breached the duty that it owed claimant's son.

Despite the fact that she ultimately concluded erroneously that the Commission lacked jurisdiction to rule on this claim, the evidence does not preponderate against the findings of the Commissioner. The Court of Appeals may affirm a judgment on different grounds than those relied upon by the trial court when the trial court reached the correct result. *In re Estate of Jones*, 183 S.W.3d 372, 378 n.4 (Tenn. Ct. App. 2005).

*Id*. at 10. This Court then proceeded to consider the mother's remaining claims and whether the Commission possessed subject matter jurisdiction to address them.

In its conclusion, the *Mullins I* Court reiterated that the child <u>was</u> in the care, custody, and control of DCS with regard to the mother's negligence claim concerning the investigation of the initial placement of the child in the aunt's home; however, the Court concluded that the Commission had arrived at the proper result when dismissing that claim. *Id*. at 15. The Court therefore affirmed the Commission's judgment of dismissal with a modification concerning the claim of negligence prior to the transfer of custody. *Id*. In other words, the *Mullins I* Court determined that the Commission did possess subject matter jurisdiction as to that claim because the child was in the care, custody, and control of DCS before custody was granted to the mother's aunt.

On appeal to our Supreme Court in *Mullins II*, the High Court noted:

The Court of Appeals ruled that the Claims Commission had jurisdiction to hear Ms. Mullins' claim relative to [the child's] placement with [the mother's aunt], because at that time, DCS had custody and control of [the child] and concurrent responsibility for his care, but that DCS was entitled to quasi-judicial immunity regarding its investigation of the suitability of [the mother's aunt] and her home and its recommendation to the juvenile court. *Mullins v. State*, No. M2008-01674-COA-R3-CV, 2009 WL 1372209, at *9 (Tenn. Ct. App. May 15, 2009).[FN] The Court of Appeals further held that the Claims Commission did not have jurisdiction to hear claims alleging negligence by DCS that occurred after the juvenile court's order granting custody to [the mother's aunt] and the placement of the children in her home, because at those times DCS did not have care, custody, and control of the children. We granted Ms. Mullins' application for permission to appeal.

- 12 -

The issue of the correctness of this ruling has not been raised by Ms. Mullins. Consequently, we express no opinion regarding the correctness of the Court of Appeals' ruling on DCS's quasi-judicial immunity, which is not before us on appeal. *See* Tenn. R. App. P. 13(b).

*Mullins II*, 320 S.W.3d at 278. Accordingly, the issue addressed by our Supreme Court in *Mullins II* was "whether the Tennessee Claims Commission had subject matter jurisdiction to hear a claim for negligence against the State which arose after a child who had been removed from his mother's care was placed in the temporary custody of a third party by court order." *Id*. The Court did not address, however, any issue concerning whether the child was in the care, custody, or control of DCS with regard to the mother's claims concerning the investigation of the initial placement of the child in the aunt's home.

Similar to the mother in *Mullins II*, Parents herein have asserted a claim of negligence by DCS with regard to its investigation of Grandparents' home and its recommendation that the Child be placed there. This claim is predicated on alleged negligence that occurred during the timeframe that began when the Child was removed from Mother's home and ended when the Child was placed in the custody of Grandparents by the juvenile court. Based on this Court's ruling in *Mullins I*, which was not addressed by the Supreme Court on appeal in *Mullins II*, the Child was clearly in the care, custody, or control of DCS during that timeframe. *See Mullins I*, 2009 WL 1372209, at * 8; *see also* Tenn. Code Ann. § 37-1-102(b)(17) (defining "foster care" as "the temporary placement of a child in the custody of the department of children's services or any agency or institution, whether public or private, for care outside the home of a parent or relative, by blood or marriage, of the child, whether the placement is by court order, voluntary placement agreement, surrender of parental rights or otherwise").

Furthermore, we agree with Parents that the facts of the instant action closely resemble the facts presented in *In re Demitrus*, No. E2009-02349-COA-R3-CV, 2011 WL 863288 (Tenn. Ct. App. Mar. 14, 2011), with respect to the timeframe between the Child's removal from Mother's home and entry of the juvenile court's order awarding custody to Grandparents. In *Demitrus*, a DCS employee had informed the parents that their children would be removed unless the parents agreed to place them in a safe home until the parents' housing issues could be resolved. *See* 2011 WL 863288, at *1. During his meeting with the parents, the DCS employee prepared a "safety plan" for the children that placed them in the temporary care of the parents' neighbor, S.H., until such time as the parents could locate suitable housing. *Id*. at *2. The parents signed the plan, and the children were placed in S.H.'s care. *Id*. No evidence was presented that DCS investigated S.H. or her home; however, there was proof that S.H.'s apartment building manager advised the DCS employee that he should not leave the children with S.H. *Id*.

- 13 -

One of the children tragically drowned a few days later when S.H. left him unattended in a bathtub. *Id*. at *3.

The parents in *Demitrus* filed a claim with the Commission, pursuant to Tennessee Code Annotated § 9-8-307(a)(1)(E), asserting that DCS was negligent for, *inter alia*, failing to investigate S.H. or her home before placing the children there and ignoring warnings that the children should not reside with S.H. *Id*. The Commission determined that it maintained subject matter jurisdiction to hear the claim because the children were in the care and control of DCS due to (1) DCS's intervention in the lives of the parents and children by threatening the children's removal from the parents unless a safety plan was enacted; (2) development of the safety plan; and (3) exerting control over whether the children could be returned to the parents. *Id*. at *3-4.

On appeal in *Demitrus*, this Court agreed that subject matter jurisdiction was proper in the Claims Commission, explaining:

> The State's position in the present case is that *Mullins* controls this case and requires a holding that the Commission does not have jurisdiction. The holding of *Mullins* is obviously important, but it is equally important that we understand what *Mullins* did not hold. *Mullins* affirmed that part of this court's judgment which "held that the Claims Commission did not have jurisdiction to hear claims alleging negligence by DCS that occurred *after the juvenile court's order* granting custody to [the aunt] and the placement of the children in her home." *Id*. at 278 (emphasis added). The issue of the correctness of this court's ruling "that the Claims Commission *had jurisdiction to hear Ms. Mullins' claim relative to [the child's] placement with [the aunt], because at that time, DCS had custody and control* of [the child] and concurrent responsibility for his case" was not raised before the Supreme Court and was not addressed. *Id*. & n.4 (emphasis added).

> * * *

> The bright line that separates the present case from *Mullins* is that the only claim being examined by the High Court in *Mullins* for jurisdiction was based on facts, *i.e.*, the negligent investigation, that came *after* the child was placed in a third party's custody by court order. The Court expressly stated that the "State did not have care, custody, or control of [the child] after the juvenile court awarded custody of him to [the aunt]—at this point, [the aunt] was the only one who had custody of [the child] and thus the responsibility and obligation to provide care for him and control over him." *Id*. Thus, the only basis for jurisdiction would have been the lone act or omission of negligent inspection for which there existed no private right of action.

In the present case, there was no such court order placing custody in [S.H.].  [S.H.] had the Infant as the "placement custodian" as a result of the safety plan which was initiated by the Department.  In our opinion in *Mullins*, we held that the Commission *had jurisdiction* over the "one claim" concerning the Department's actions that preceded the court ordered placement with the aunt.  That "one claim . . . that falls within this time frame is the contention that DCS was negligent in its investigation of the [aunt's] home prior to [the child's] placement there [by court order]."  2009 WL 1372209 at *9.

* * *

The Commission determined in the present case that the Infant was not in the custody of the DCS, but was nevertheless in the control of the DCS.  The High Court in *Mullins* recognized that the mere lack of legal or physical custody is "not entirely determinative."  320 S.W.3d at 281.  The proper inquiry is whether the State's involvement is such that it may be fairly said to have exercised either care, custody, or control.  *Id*. (analyzing *Hembree v. State*, 925 S.W.2d 513, 517 (Tenn. 1996) (jurisdiction over release of a mental patient into the community); *Stewart* [*v. State*], 33 S.W.3d [785,] 792 [(Tenn. 2000)] (read in the disjunctive so that failure to exercise control will give jurisdiction if there was a legal duty to control or actual control assumed but negligently exercised); and *Conley* [*v. State*], 141 S.W.3d [591,] 591 [(Tenn. 2004)] (no jurisdiction for negligent preadmission screening because no showing that limited involvement devolved into control).  The inquiry is made in the disjunctive; the State need not have exercised all three functions.  *Stewart*, 33 S.W.3d at 792.

Following the guidance we have been able to glean out of the cases, with particular reference to that part of our opinion in *Mullins* that was not at issue on appeal to the High Court, we hold that jurisdiction was proper in the present case.  This case is not controlled by the Supreme Court's opinion in *Mullins*, because of the distinctions we have discussed.  Our opinion in *Mullins* suggests that the mere fact that the parents consent does not prevent the placement from being one that would invoke jurisdiction for "care, custody and control" pursuant to Tenn. Code Ann. § 9-8-307(a)(1)(E).  It also suggests that a DCS initiated removal of a child out of the care of the parents and placement in another home, however temporary, and however parental friendly, will invoke jurisdiction.  However, given the record in the present case, we need not go that far to find jurisdiction.  As found by the Commission, the record indicates that unless the parents had called [the DCS employee] on the day he found [the children] in

- 15 -

separate homes, he would have intervened through some channel more drastic than a "team meeting." The team meeting did happen, at which time DCS told the parents—it did not ask—that the situation must change. Once the team meeting was conducted, specific standards were set which (1) required that the children remain with [S.H.], (2) required that the parents maintain contact with DCS, (3) forbade the parents from moving the children to a place not approved by DCS, and (4) required that any new residence be approved by DCS. According to the testimony of DCS employees, the children could not be returned to their parents without a second meeting between the parents and a DCS decision maker. The safety plan itself characterizes the situation with [S.H.] as a "placement" of the children. According to DCS employee Crumly, the term "placement" is generally synonymous with "custody." A safety plan generally is considered by the Department to be an "intrusive" measure. The regulations that the Department follows to implement a safety plan confirm a high level of DCS involvement, as found by the Commission. In short, we agree with the Commission that the facts in this case establish DCS control sufficient to establish jurisdiction in the Commission. This is not a situation where we are being asked to create a "new category." *See Northland* [*Ins. Co. v. State*], 33 S.W.3d [727,] 730 [(Tenn. 2000)]. Rather, this is a situation "where the statutory language legitimately admits of various interpretations" and we are simply following the General Assembly's instructions to "give the most favorable view in support of the . . . claim." *Stewart*, 33 S .W.3d at 791 (citations and internal quotation marks omitted).

*Id*. at *15-17.

Similarly, in the instant action, Parents asserted a claim of negligence by DCS with regard to its investigation of Grandparents' home and its recommendation that the Child be placed there despite the fact that DCS employees had knowledge that Grandparents' home was unsuitable. As such, this claim is based on alleged negligence that occurred during the timeframe between the Child's removal from Mother's home and the transfer of custody to Grandparents by the juvenile court. The Child was clearly in the care, custody, or control of DCS during that timeframe. *See Demitrus*, 2011 WL 863288, at *15-17; *Mullins I*, 2009 WL 1372209, at * 8.

According to Parents' complaint, Ms. McSwain, as the DCS case manager assigned to this matter, encouraged Mother to sign the IPA, placing the children in the home of Grandparents. The copy of the IPA contained in the record, which utilizes a form generated by DCS, demonstrates that Ms. McSwain was responding to allegations of abuse and neglect in Mother's home. The IPA states that the children would be "safety placed" with Grandparents "until otherwise noted by DCS and/or the [juvenile

court].”  The IPA further states that the children would be supervised by Grandparents at all times and would require separate sleeping arrangements.  In addition to Mother's signature, the IPA bears the signatures of Ms. McSwain and her supervisor, Ms. Dixon.

Parents contend that by virtue of the IPA and placement of the children in the home of Grandparents, DCS was in control of the children for the purposes of Tennessee Code Annotated § 9-8-307(a)(1)(E).  We agree.  Clearly, Mother did not initiate a placement agreement that removed her children from her home on her own volition.  Although the IPA states that it is a "voluntary agreement between the signed parties," we note that the IPA, which was executed by Mother and two DCS employees, utilizes a DCS form, clearly references DCS involvement with the family due to allegations of abuse and neglect, and provides for placement of the children outside Mother's home.  As such, the IPA demonstrates a significant amount of DCS involvement and control concerning the Child.  In addition, although the IPA does state that it can be revoked, it also states that the children would remain with Grandparents "until otherwise noted by DCS and/or the [juvenile court]."

Parents further claimed that DCS was required to follow a set protocol before placing the children in Grandparents' home, including a placement assessment and home visit, and that DCS was required to follow up on the placement by conducting additional home visits.  These allegations are supported by Ms. McSwain's termination memorandum from the DCS Commissioner, which states in relevant part:

> On January 30, 2018, an Immediate Protection Agreement (IPA) was initiated to place the children with non-biological (acting) grandparents, who live in Warren County.  Before the children were placed with the grandparents, the safety of the grandparents' home needed to be confirmed prior to placement per DCS policy 14.9, Child Protective Services Immediate Protection Agreements.
>
> To determine the safety of the grandparents' home, DCS staff in Warren County were contacted to assess the home.  On January 30, 2018, CPSI [Child Protective Services Investigator] Shelley Smith went to the grandparents' home and made an assessment of the home.  CPSI Smith advised you and your supervisor, Lead Investigator (LI) Cicely Dixon, verbally and in writing, that she did not find the home to be a safe placement for the children.  At that time, CPSI Smith advised against placing the children in the home and told you and LI Dixon in Warren County, if children were found to be placed in such an environment, they would be removed.  You also received pictures of the home which showed CPSI Smith's concerns.

- 17 -

You and LI Dixon proceeded in placing the children in an unsafe home rather than relying on the report from CPSI Smith. In addition, you stated during the IAD [DCS Internal Affairs Division] interview that LI Dixon had informed the grandfather that the residence needed some cleaning and he was to send photos after cleaning.

* * *

You never went to the home, and you never requested a follow up walk-through from Warren County CPSI staff during the months of February, March, April and May 2018. During your interview with IAD, you stated that you did not know how to request a courtesy walk through from another county, although this was what was done initially on this case, and you have completed this type of request on other cases.

As the assigned Case Manager for this case, you never took any action to ensure the home was safe. Regardless of reporting that your supervisor did not direct you to visit the home, as an experienced Case Manager for DCS, you were aware that per policy 14.7 Work Aid 3, you are required to see children on your caseload once a month in the home.

As explained in *Demitrus*, the fact that "DCS initiated removal of a child out of the care of the parents and placement in another home, however temporary, and however parental friendly, will invoke jurisdiction" of the Claims Commission. *In re Demitrus M.T.*, 2011 WL 863288, at *15-17. Here, DCS initiated the IPA that placed the Child in Grandparents' home, an "agreement" contemplating that the Child would remain there pending further action by DCS or the juvenile court, thereby demonstrating DCS's control over the situation. In addition, DCS clearly maintained a duty to investigate Grandparents and their home before such placement occurred and to continue to monitor the situation, at least until such time as custody was transferred to Grandparents by the juvenile court. By reason of these circumstances, DCS maintained control over the Child during the relevant timeframe pursuant to Tennessee Code Annotated § 9-8-307(a)(1)(E)'s requirement that the State exercise "care, custody and control of persons." We reiterate that "inquiry is made in the disjunctive; the State need not have exercised all three functions." *See In re Demitrus M.T.*, 2011 WL 863288, at *16.

As the Commission concluded, the main distinction between the case at bar and *Demitrus* is that there was never a court order transferring custody in *Demitrus*. *See id.* However, this does not change the significant fact that in this matter, DCS maintained some measure of control regarding placement of the Child before the juvenile court transferred custody, invoking the Commission's jurisdiction, pursuant to Tennessee Code Annotated 9-8-307(a)(1)(E), for purported negligence that occurred during that timeframe. As such, the fact that no custody order existed in *Demitrus* is a distinction

- 18 -

without a substantive difference with respect to any negligence occurring before the transfer of custody in this case.

DCS argues that Parents have not shown that DCS's negligence was the proximate cause of the Child's death. However, the issue confronted by the Commission—and by this Court on appeal—was whether the Commission possessed subject matter jurisdiction to adjudicate Parents' claim. We conclude that it did. Proximate causation is an issue to be addressed by the Commission upon remand.

Finally, we recognize that Parents have contended that the juvenile court's orders transferring custody did not apply to the Child because he was not specifically mentioned in the body of the orders although he was named in the case caption. The Commission determined in its order that in addition to naming the Child in the case caption, the juvenile court's orders made specific references to "the children" and found them all to be dependent and neglected. We agree. In its April 18, 2018 protective custody order, the juvenile court specifically named the Child and his siblings in the caption and found that "the above-named child(ren) is/are dependent and that said child(ren) should be brought into the protective custody of this Court and that temporary custody be awarded to [Grandparents] pending an investigation and adjudication of the custody of said child(ren)." Ergo, it is clear that the juvenile court's order applied to the Child.

## V. Conclusion

For the foregoing reasons, we vacate the order of the Commission dismissing Parents' claims for lack of subject matter jurisdiction. Having determined that subject matter jurisdiction exists in the Commission, we remand this matter to the Commission for further proceedings consistent with this opinion. Costs on appeal are assessed against the State of Tennessee.

s/ Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE

- 19 -